UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NATIONAL ASSOCIATION OF BROADCAST
EMPLOYEES AND TECHNICIANS –
COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO

        Plaintiff,                  Case Number 04-10033-BC
                                                          Honorable David M. Lawson

v.

MEREDITH CORPORATION, d/b/a
MEREDITH BROADCASTING GROUP
and its TV station WNEM-TV,

        Defendant.
_____/

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
TO CONFIRM ARBITRATION AWARD AND DENYING MOTION
FOR SUMMARY JUDGMENT TO VACATE ARBITRATION AWARD**

      The question presented by this case is whether a labor arbitrator acted within his authority when he determined that certain conduct committed by a television station employee did not constitute "just cause" for termination within the meaning of a collective bargaining agreement (CBA) and ordered reinstatement of the employee. The plaintiff, the National Association of Broadcast Employees and Technicians–Communications Workers of America, AFL-CIO (the Union), has brought this action under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), to confirm and enforce the arbitral award. In response, the employer, defendant Meredith Corporation (Meredith), filed a counterclaim against the Union to vacate the award, and the parties have now filed cross-motions for summary judgment.

      The defendant contends that the contract language requires the Court to review the arbitration award *de novo* rather than deferentially, the arbitrator had no authority under the CBA

to order reinstatement, and the award should be vacated because the arbitrator usurped management's authority by deciding what conduct constituted "just cause" for termination when that determination was reserved in the contract to the employer. These same parties brought a similar dispute to this Court in 2003, which involved a different employee but the same collective bargaining agreement. The defendant raised the same arguments concerning the standard of review and the scope of the remedy, which the Court decided: the traditional deferential standard of review for labor arbitration awards should apply, and the CBA provided authority to the arbitrator to fashion a remedy that included reinstatement. *See National Ass'n of Broadcast Employees and Technicians v. Meredith Corp.*, 2004 WL 1347032 (E.D. Mich. Apr. 28, 2004) (Lawson, J.) (unpublished). The defendant has presented nothing in this case that suggests a different result is called for here with respect to those two arguments. The main issue for resolution in this case is whether the CBA granted the arbitrator the authority to decide whether the employee's conduct, the particulars of which were uncontested, amounted to "just cause" for termination. The Court now finds that the arbitrator did not exceed his authority in rendering the award and therefore will grant the Union's motion for summary judgment to confirm the award and deny Meredith's motion to vacate the award.

I.

The employee, James Webb, was a technician who assisted in the production of television news shows at WNEM-TV, which is also known as "Channel 5." Webb's job included operating a camera, preparing on-screen graphics, and operating other equipment during on-air productions. He worked at the Channel 5 studios in Saginaw, Michigan, which is owned by Meredith Corporation. During live performances, the production team members communicate with each other

over closed circuit headsets that allow all the team members to listen and speak to everyone in the circuit, but the conversations are not broadcast on the air. Webb was fired on March 12, 2003 for using profane language in this closed circuit during the production of a news show. At the time of his termination, Webb was on probation for a previous incident in which he engaged in disruptive behavior that included the use of foul language.

Webb is a member of the Union, which entered into a collective bargaining agreement (CBA) with Meredith on May 1, 2001. Article 11.1 of the CBA states that "[r]egular employees may be discharged for just cause," and if the employee "believes that he has been discharged without just cause," he may avail himself of the grievance procedure set forth in the CBA. Compl. Ex. 1, CBA at 27. Article V of the CBA sets forth the grievance process agreed upon by Meredith and the Union. The provisions establish graduated steps for dispute resolution culminating in binding arbitration. Section 5.4 states:

> The Arbitrator shall be selected in accordance with the then obtaining labor arbitration rules of the American Arbitration Association. The award of the Arbitrator shall be written and shall be binding upon the Employer, the Union and the Employees involved in the controversy, subject to judicial review by either party.

*Id*. at 6.

Webb's grievance was not resolved at the initial stages, and an arbitration hearing was held before arbitrator Donald F. Sugerman on October 30, 2003. The arbitrator heard testimony and reviewed documents, including Webb's personnel file. It appears that prior to the incident that resulted in Webb's termination, he received an appraisal mentioning his lack of anger control and two serious reprimands for his use of profanity. A May 2002 appraisal noted that Webb "[n]eeds to pay attention to working under pressure and losing his temper" and that he should "work on his anger

control." Compl. Ex. 2, Arbitration Opinion and Award at 6-7. After a July 19, 2002 newscast, Gregory Surma, Webb's supervisor, admonished Webb in writing that:

> you admitted . . . making an obscene gesture towards another member of the Production Department during the newscast. This was wrong on two different counts: 1. It showed a lack of respect and customer focus toward a fellow crew member. 2. It disrupted the execution of the newscast and was a distraction on the set. . . . [I]t is expected that you will show courtesy and restraint in dealing with other members of the WNEM news team. . . . Thank you for understanding this, and for handling future incidents of this nature in a more professional manner.

*Id*. at 9. On December 19, 2002, Webb told another employee over the intercom system to "Blow me, Toots" and twice to "Blow it out you're a\*\*." *Id*. at 10. Again, Surma counseled Webb in writing, stating:

> Jim, behavior of this sort will not be tolerated. I have come out with many notes concerning the proper decorum on the intercom system. Our newscast was our most important product at the time, and you chose to disrupt the crew and carry out an argument with a crew member. . . . Your hostile and disruptive behavior must stop, and cannot be repeated. Future incidents of this nature may result in further disciplinary action up to and including discharge.

*Id*. at 11. Surma suspended Webb for three days without pay and placed him on probation for ninety days starting on January 7, 2003 when he returned. In February of that year, Webb completed a self-appraisal that admitted he would be more effective if he controlled his temper. *Id*. at 12.

On March 10, 2003, the director, Lane Valliere, and producer, Mike Justice, got into an apparent argument during the 5:30 p.m. newscast. Webb operated a camera during the show and was privy to Valliere's comments over the closed circuit headset system exhibiting frustration and referring to Justice as a "loser" and an "idiot." Toward the end of the argument between Valliere and Justice, Webb gratuitously interjected "Well . . . maybe if we had a producer who knew what the f\*\*k he was doing." *Id*. at 12, 16. The probation period had not expired. Surma terminated Webb on March 12 for the comment made two days earlier.

As mentioned above, Webb and the Union grieved the termination. Arbitrator Sugerman issued a twenty-five-page opinion on January 16, 2004 sustaining the grievance. He found that Meredith lacked just cause to discharge Webb, and he set aside the discharge and ordered that Webb be reinstated with seniority restored, the discharge expunged, and any loss of earnings and benefits compensated. *See* Compl. Ex. 2, Arbitration Opinion and Award at 25. The arbitrator's rationale is set forth below:

> This brings us to the March 10, 2003 incident for which the Grievant was discharged. The Union was under the impression that profanity was the reason for Webb's discharge and it defended this case on this basis. The Employer, on the other hand, claims that the discharge was for just cause because of Webb's "disruptive behavior" and/or the use of profanity.
>
> I have carefully examined the transcript of the March 10 headset recordings and am unable to conclude that Webb's remarks, reviewed in conjunction with his prior suspension and in light of the context of what was said by others, was just cause for his discharge.[19]

---

[19] NABET-CWA argues that it was only happenstance that caused the employer to monitor the headset recordings for March 10, 2003, and in any event, there was an earlier agreement by the parties that such recordings would not be used to discipline employees. I am unable to accept either argument. There were significant problems in the 5/5:30 p.m. newscasts. The recording was the best evidence to identify the problems and to insure they did not recur. Whether this was by happenstance or design is immaterial. The Union contends that its agreement to allow the Company to record headset traffic was based upon the commitment that recordings would not be used for discipline. The agreement was allegedly made when the commitment that recordings would not be used for discipline. The agreement was allegedly made when the recording system was introduced in 1996. It is not clear to me that the Union's permission was required for the Company to install the recording device. The headsets were used for communication in getting out the Employer's product. It presumably could have had someone make verbatim notes of the communications had it chosen to do so. Thus, recording the conversation does not appear to be a term or condition of employment that would have permitted the Union to preclude its introduction. Further, it is likely that were there such an agreement it would have been memorialized. The parties have included less important items in their Agreement and letters of understanding.

Regardless, if my analysis is incorrect, NABET-CWA will have an opportunity to correct the matter shortly when it enters negotiations for a new contract.

The conversation among production employees and the Producer took place, for the most part, during a commercial break near the end of the newscast while, according to Surma, the team should have been regrouping. Obviously Valliere was very upset. He spoke about walking out, complained that the product was junk, and the News department failed to get it to him on time; that the (News department) were losers; referred to the Producer as "this idiot behind me;" referred to the "idiots in the back," and complained that he had no opportunity to preview the scripts. He went on and on in this vane. Others added their "two cents" from time to time. For example, Wieland, in apparent frustration, said, "Jesus Christ."

Webb interjected two comments during this running commentary. At one point Valliere said, "You know. . . I'm going by what the script says. . . what can I do? The script says an MCU now." Webb responded " You can tell us in advance." That first comment certainly was not disruptive. The Grievant's second statement a short while later was the one on which his discharge was bottomed.

Justice, in an attempt to explain why the freeze was not in place said, "Three people have been writing this show, so they might not have known the freeze part." Valliere responded, "Well, you know Mike, I don't know what I got . . . all I do is look at it . . . it's just 'Home Sick' now (reference to a graphic). You guys want to fly by the seat of your pants, I can fly the best I can. I don't have a freeze for that right now." Webb then made the offending remark: "Well . . . maybe if we had a producer who knew what the f\*\*k he was doing . . ."

In the scheme of things and in conjunction with what was being said by others, this singular statement by Webb was garnish, at the best. No evidence was presented to show that it disrupted production. Indeed, if there was any disruption it had to be placed squarely at Valliere's feet. The comment by Webb was impulsive and gratuitous, to be sure. It followed the same theme as that of Valliere, who referred to the Producer as an idiot – among his other complaints.[20] It was uncalled for. But it hardly rose to the level of a disruption like the one that occurred on December 18.

If Webb had said, "If we had a producer who knew what he was doing. . ." the likelihood that it would have led to any discipline, yet alone discharge, seem quite remote. Thus, it appears that the use of the word "f\*\*k" is what compelled the Employer to discharge the Grievant. I am cognizant that the use of profanity is commonplace among workers of every level and stripe. The word "F\*\*k" has become a part of the vernacular. It is no longer as shocking as it once was.[21]

---

[20] According to Surma, Valliere was demoted from his position as Director because of his comments and his actions on March 10.

[21] One need only view prime-time television, especially HBO, to prove this postulate.

The New Oxford American Dictionary provides extensive definitions of the use of the work "f**k" in various forms. It its exclamatory sense, which is how it was used by Webb, it means:

> used alone or as a noun (the f**k) or a verb in various phrases to express anger, annoyance, contempt, impatience or surprise, or simply for emphasis. (at p. 683)

Here the word was used for emphasis.[22]

The Employer concedes that similar and worse language has been used in the station by employees without them being subjected to discipline. Accordingly, I conclude that the regardless of how the offending sentence is dissected, the Employer did not have the requisite just cause set forth in the Agreement to dismiss Webb.[23] I agree, however, that Webb has a temper problem that needs to be addressed if he is to continue and grow as an employee of WNEM.

## AWARD

The grievance is sustained. For the reasons set forth above, the Employer did not have just cause under the Agreement to discipline or discharge the Grievant. Webb is to be offered immediate reinstatement to his former position of employment, with his seniority restored intact. Reference to the discharge is to be expunged from his personnel file. Webb is also to be made whole for any loss of earnings and benefits he may have sustained.

If Webb is to live up to his potential and be the productive employee that the Employer expects and that he himself wishes to be, some firm direction is required. Within two weeks after reinstatement, Webb must enroll in an anger management program.[24] He must fully participate in and complete this program. The issue of back pay is remanded to the parties for their discussion, consideration, and resolution. I will retain jurisdiction for a reasonable period of time in the event they are unable to conclude the matter of back pay or there is any other dispute over the implementation of this award.

---

[22] It may also have been used to express anger or annoyance with the dilly dallying that was going on. But it was not directed at Justice, as in "go f**k yourself" or "f**k off."

[23]The Employer's contention that comments made by the Grievant had the potential to go out on the air is a red herring.  It acknowledged this was a technical possibility, but unlikely.  It did not go out on the air.  This was an effort to simply bolster the Employer's case.  The argument is without merit.

[24]If the anger management program is covered by the Employer's Insurance and Webb is, for some reason not eligible for the benefit immediately upon reinstatement, the enrollment period will be extended to two weeks after he becomes eligible.

Compl. Ex. 2, Arbitration Opinion and Award at 21-25 (emphasis in original).

The Union filed a complaint in this Court to enforce the arbitration award on February 12, 2004 after Meredith refused to reinstate Webb.  Meredith filed a counterclaim on March 15, 2004 alleging that the arbitrator's award does not "draw its essence" from the Collective Bargaining Agreement because the arbitrator relied on facts outside the record and failed to consider the television station's obligation to not broadcast obscene or indecent content.  Answer and Countercl. at ¶ 20.  In addition, the defendant argued that by awarding reinstatement, expungement, and back-pay the arbitrator failed to address section 11.3 of the Contract, which provides for severance pay when an employee is "terminated for other than just cause."  Compl. Ex. 1, CBA at 27.

On July 7, 2004, the Union filed a motion for summary judgment, and on July 12, 2004, Meredith filed its motion for summary judgment.  Both parties filed responses.  Meredith argues in its motion that the Court should vacate the arbitration award because the arbitrator exceeded his authority.  The Court heard argument from counsel on September 15, 2004.

II.

Meredith first reiterates the argument concerning standard of review that it raised in the previous action.  It contends that Section 5.4 of the CBA, which states, "The award of the Arbitrator shall be written and shall be binding upon the Employer, the Union and the Employees involved in

the controversy, *subject to judicial review by either party*" (emphasis added), requires the Court to evaluate the arbitrated controversy *de novo*. For the reasons stated in the previous case, the Court finds the defendant's argument untenable. There is no indication in the CBA or elsewhere that the parties bargained for or agreed upon an expanded standard of review of arbitral decisions. Rather, the appropriate standard of judicial review is the one typically employed under Section 301 of the LMRA, which has been described as "one of the narrowest standards of judicial review in all of American jurisprudence." *Lattimer-Stevens Co. v. United Steelworkers of Am.*, 913 F.2d 1166, 1169 (6th Cir. 1990); *see also Way Bakery v. Truck Drivers Local No. 164*, 363 F.3d 590, 593 (6th Cir. 2004) (quoting *Tennessee Valley Auth. v. Tennessee Valley Trades & Labor Council*, 184 F.3d 510, 515 (6th Cir. 1999) (per curiam); *Beacon Journal Publ'g Co. v. Akron Newspaper Guild, Local No. 7*, 114 F.3d 596, 599 (6th Cir. 1997) ("The Supreme Court has made clear . . . that courts must accord an arbitrator's decision substantial deference because it is the arbitrator's construction of the agreement, not the court's construction, to which the parties have agreed.").

"The Supreme Court has tightly circumscribed the authority of federal courts to overturn arbitration awards, and has consistently held that they may not do so as long as the arbitrator's award draws its essence from the collective bargaining agreement, and is not merely his own brand of industrial justice." *Eisenmann Corp. v. Sheet Metal Workers Int'l Ass'n. Local No. 24, AFL-CIO*, 323 F.3d 375, 380 (6th Cir. 2003) (internal quotations omitted) (*quoting United Paper workers Int'l Union, AFL-CIO v. MISC., Inc.*, 484 U.S. 29, 36 (1987)). "[I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Ibid.* (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)).

III.

Meredith insists that the arbitrator's finding that Webb's use of profane language over the unaired internal communications system was not just cause for his termination failed to draw its essence from the CBA. The Sixth Circuit lists four instances in which an arbitral award fails to draw its essence from a labor agreement: when "(1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on general considerations of fairness and equity instead of the exact terms of the agreement." *Int'l Union, UAW v. Dana Corp.*, 278 F.3d 548, 554 (6th Cir. 2002) (quoting *MidMichigan Reg'l Med. Ctr.-Clare v. Prof'l Employees Div. of Local 79*, 183 F.3d 497, 502 (6th Cir. 1999)). Meredith argues here that the arbitrator's finding of just cause is not rationally supported by or derived from the contract and is based on a general consideration of fairness and equity. The defendant alleges that the arbitrator relied on matters outside the agreement, the FCC regulations prohibit such language on-air, and that the employee handbook that the CBA incorporates prohibits employee use of profanity.

Section 5.5 of the CBA sets forth the limitations on the authority of the arbitrator:

> The arbitrator shall have no power or authority to add to, subtract from or in any way modify the terms of this Agreement; shall not substitute his judgment or discretion for that of management with respect to any matter reserved to management's judgment or discretion; but shall have authority only to interpret and apply the provisions of this Agreement which shall constitute the basis upon which the Arbitrator's decision shall be rendered.

Compl. Ex. 1, CBA at 7. The CBA also includes language that stakes out the employer's prerogative in dealing with its employees. Section 1.4 states:

> Except as expressly abridged by any provision of this Agreement, the Employer reserves and retains exclusively all of its normal and inherent rights with respect to the management of the business, including its right to . . . transfer, promote or

>demote Employees, or to layoff, terminate or otherwise relieve Employees from duty for lack of work other legitimate reason; to make and enforce reasonable rules for the maintenance of discipline; to suspend, discharge, or otherwise discipline Employees for just cause.

*Id.* at 2. Pursuant to that section, Meredith published and distributed an employee handbook, which, according to its text, was intended to serve as a functional substitute for work rules. The handbook reads:

>Meredith does not have a rigid or specific disciplinary policy, and consequently, uses progressive steps of discipline at its own discretion. We do not attempt to anticipate all performance or conduct violations and their consequences. Each case has its own individual and complex circumstances. We believe that disciplinary action is case-specific and takes many forms. Therefore, this intentionally general policy allows flexibility in matching discipline to each situation.

Answer Ex. 1, Handbook at 1. The handbook provides managers guidance for disciplining employees:

>a. Disciplining an employee is not an easy task. Managers do not carry this burden alone. Human Resources provides guidance and a precedent review, and should be consulted prior to disciplinary action. The level of discipline required varies with the situation. Certain offenses call for advance stages of discipline, up to and including discharge.
>
>b. Disciplinary action beyond an oral warning should be approved by Human Resources and the manager's supervisor before being given. Such discipline should be documented in the employee's official personnel file and remain there indefinitely. Forms of discipline may include, but are not necessarily limited to: training, written warning, re-assignment, demotion, probation, suspension, and/or discharge.

*Id.* at 1. The handbook also counsels managers to discuss performance and conduct with all their employees and to document discipline. The handbook gives notice to employees that:

>c. Meredith reserves the freedom to discipline as needed. This policy's flexibility is not to be mistaken for a lack of work rules. Although we maintain the freedom to apply discipline as we see fit, below are some examples of performance or conduct that may result in disciplinary action, up to and including discharge

-11-

*Id*. at 2. Examples include: "Fighting, disorderly conduct, or misconduct," "Offensive language or use of profanity," and "Disruption of the workplace through words or actions or inaction." *Ibid*. It is undisputed that Webb received a copy of the handbook.

The defendant claims that it has a special need to enforce standards of conduct among its employees concerning proper language because it produces its product for public consumption in a highly regulated atmosphere. It cites to several recent incidents of unintended exposures and exhibitions – the broadcast of foul language by a production staff member by CNN during the Democratic national convention and the partial nudity during the 2004 Super Bowl half-time display, for example – as evidence of the need to closely monitor and discipline its employees' use of language in the workplace. If the need to do so were as urgent as suggested by the defendant, one might expect its work rules to reflect a rigid, well-defined, and specifically-enforced code of conduct. However, the handbook at most can be described as an amalgamation of guidelines intended to allow discretion in the employer to flexibly deal with workplace situations as they occur. If an employee disagrees with a discretionary decision by management, the CBA clearly gives the employee the right to grieve the adverse job action and ultimately seek a decision from an arbitrator. *See* Compl. Ex. 1, CBA art. 11.1, at 27 (stating that "[i]n the event a regular Employee is discharged by the Employer, and the Employee believes he has been discharged without cause, this matter may be handled as a grievance under the procedure provided in Article 5 providing for grievances, disputes and arbitration"). The decision whether the employer had just cause to terminate the aggrieved employee, as the CBA requires, necessarily will require the arbitrator to interpret the CBA in light of the work rules enacted pursuant to it by the employer.

This Court previously has noted that "[t]he Sixth Circuit has repeatedly recognized that the resolution of ambiguities created by the interplay of work rules and collective bargaining agreements fall within the ken of arbitrators, informed by their judgment and special knowledge of the workplace." *MidMichigan Regional Medical Center v. United Steel Workers of America, Local 12075*, 2003 WL 21222697, at *5 (E.D. Mich. 2003) (Lawson, J.) (unpublished) (citing *Eberhard Foods Inc. v. Handy*, 868 F.2d 890 (6th Cir.1989)). In *Eberhard* the court held that "it is the language of the CBA and the arbitrator's own construction thereof, which determines the scope of the arbitrator's authority." *Eberhard*, 86 F.2d at 892. Having bargained "to have disputes settled by an arbitrator chosen by them," Meredith is bound by the "arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *MISCO*, 484 U.S. at 37-38. Moreover, an arbitrator's authority to interpret a "just cause" provision is not negated by work rules or employer policies that mandate discharge for certain offenses. *See General Truck Drivers v. Dayton Newspapers, Inc.*, 190 F.3d 434, 438-39 (6th Cir.1999). That principle applies with greater force when the employer's work rules do not *mandate* discharge under any circumstances.

Webb's conduct in this case certainly was not exemplary. There is evidence in the record that supports Meredith's decision to terminate him: Webb had engaged in disruptive conduct in the past, he was warned that he needed to control his temper, after another incident he was told to mind his mouth and placed on probation, and on March 10, 2003 he gratuitously inserted himself into someone else's argument (while still on probation) and uttered profanity to boot. The arbitrator determined however that in the context of the occurrence, Webb's indiscretion did not amount to just cause warranting termination. Since the parties bargained for an arbitrator to interpret the "just cause" language of the CBA, this Court is not in a position to second guess that determination, since

-13-

the arbitrator in arriving at his conclusion merely interpreted the CBA and harmonized it with the work rules; no more, no less.

If the employer believes it needs absolute control to maintain a sterile studio – including the unfettered and unreviewable discretion to discipline employees who contaminate the environment with their language – the employer is free to bargain for that privilege. As the Court observed in the previous case between these parties:

> As *Eberhard* and its progeny make clear, the parties may restrict the arbitrator's authority to alter the employer's choice of discipline. An obvious way to achieve that result is to provide in the CBA that the employer's choice of discipline may not be second-guessed by the arbitrator. *See Int'l Bro. of Elec. Workers, Local 429 v. Toshiba Am., Inc.*, 879 F.2d 208, 210 (6th Cir.1989) (affirming lower court's order vacating arbitrator's award of reinstatement where the bargaining agreement stated that "[a]ny disciplinary action, including discharge taken as a result of a violation . . . shall not be altered or amended in the grievance and arbitration procedures"); *Kar Nut Prods Co. v. Int'l Bro. of Teamsters, No. 92-2084*, 1993 WL 304467, at *3 (6th Cir. Aug. 10, 1993) (unpublished opinion) (noting that "a party is free to limit the arbitrator's authority to fashion a remedy by careful drafting of the collective bargaining agreement"); *Highway & Local Motor Freight Employees Local Union No. 667 v. Wells Lamont Corp.*, 170 F. Supp.2d 796, 799 (W.D. Tenn.2001) (affirming arbitration finding that satisfactory cause had been shown for termination of employment, and noting that a "just cause" provision limiting the discretion of arbitrator had existed in a previous agreement between the parties, but not the agreement at issue in the case).

*National Ass'n of Broadcast Employees and Technicians*, 2004 WL 1347032, at *9. The CBA presently contains no such provision, however.

The Court finds that the arbitrator acted within his authority when he determined that the employer did not establish just cause to terminate Webb based on his March 10, 2003 conduct.

IV.

As a final matter, Meredith argues once again that even if the arbitrator correctly found that just cause for termination was wanting, he still had no authority to order reinstatement. That

argument is based on a reading of the CBA that the Court rejected in the previous lawsuit between the parties. *See id.* at *7-*10 (noting that "[b]ecause the collective bargaining agreement did not *prohibit* the arbitrator from reviewing the form of discipline the employer had imposed, and because the appropriate remedy was not dictated by the agreement and work rules . . . the arbitrator 'did not act unreasonably or capriciously in construing the agreement to authorize review of the sanction imposed.' The fact that the arbitrator also imported broad concerns of fairness and equity was not fatal to his determination, as the contract's specification of 'just cause' for any discharge without any corresponding limitation upon or definition of that term left ample room for such considerations") (quoting *Eberhard*, 868 F.2d at 893). The Court adopts the same reasoning here.

V.

The Court finds that the arbitrator acted within his authority, and that the award derived its essence from the collective bargaining agreement. The considerable deference to labor arbitration awards, as noted above, will not permit this Court to upset the arbitration award in this case.

Accordingly, it is **ORDERED** that the motion for summary judgment by Meredith Corporation, d/b/a Meredith Broadcasting Group and its station WNEM-TV seeking vacation of the arbitration award [dkt # 9] is **DENIED**.

It is further **ORDERED** that the motion for summary judgment by the National Association of Broadcast Employees and Technicians – Communications Workers of America AFL-CIO seeking confirmation of the arbitration award [dkt # 8] is **GRANTED.**

It is further **ORDERED** that the arbitration award dated January 16, 2004 by Arbitrator Donald F. Sugerman in Case No. 54 30 591 03 is **CONFIRMED** and may be enforced according to its terms.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: July 8, 2005

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 8, 2005.

s/Carol J. Greyerbiehl
CAROL J. GREYERBIEHL

---

-16-